UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSARIO SALINAS,<br>Plaintiff,<br>v.<br>NANCY A. BERRYHILL,<br>Defendant. | Case No. 18-cv-04522-KAW<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 18, 23 |

Plaintiff Rosario Salinas seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision, and the remand of this case for further proceedings.

Pending before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. Having considered the papers filed by the parties, and for the reasons set forth below, the Court GRANTS Plaintiff's motion for summary judgment, and DENIES Defendant's cross-motion for summary judgment.

## I. BACKGROUND

Plaintiff applied for Title II benefits on November 6, 2014. (Administrative Record ("AR") 230.) Plaintiff asserted disability beginning November 15, 2011. (AR 230.) The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration. (AR 135, 154.) On August 18, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 170-71.)

On February 28, 2017, the ALJ held a hearing on Plaintiff's claim. (AR 71-120.) At the hearing, a translator was provided for Plaintiff. (AR 73-74.) In addition to Plaintiff, medical expert Arthur Lorber, M.D. and vocational expert ("VE") John Komar testified. (AR 97-120.) During Mr. Komar's testimony, Plaintiff's attorney asked if the jobs identified by Mr. Komar

would require communication skills of any sort. (AR 117.) Mr. Komar responded that the jobs of "order caller and ticket taker would require some communication, at least, informally, in English." (AR 117.)

Following the hearing, the ALJ rejected Plaintiff's application on June 27, 2017. (AR 16-31.) Plaintiff filed a request for review of the ALJ's decision with the Appeals Council on August 15, 2017. (AR 228-29.) The Appeals Council denied Plaintiff's request for review on June 20, 2018. (AR 1-7.)

On July 26, 2018, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Compl., Dkt. No. 1.) On February 17, 2019, Plaintiff filed his motion for summary judgment. (Plf.'s Mot., Dkt. No. 18.) On April 24, 2019, Defendant filed her opposition and cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 23.) Plaintiff did not file a reply.

## II. LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under Social Security Administration ("SSA") regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At

2

step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721. If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commissioner proceeds to step three, and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is disabled. *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments. 20 C.F.R. § 404.1520(e). If the claimant can perform such work, he is not disabled. 20 C.F.R. § 404.1520(f). RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity. 20 C.F.R. § 404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante v. Massanari*, 262 F.3d 949, 953-954 (9th Cir. 2001). The burden shifts to the Commissioner in step five. *Id.* at 954.

### III.  THE ALJ'S DECISION

On June 27, 2017, the ALJ issued an unfavorable decision. (AR 16-31.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity between the alleged onset date of November 15, 2011 through his date last insured of December 31, 2016. (AR 18.)

At step two, the ALJ identified the following severe impairments: cervical disc protrusions, lumbosacral sprain, impingement syndrome of the bilateral shoulders, carpal tunnel syndrome, headaches, and a history of depressive disorder. (AR 18.) The ALJ found that Plaintiff's past substance abuse was non-severe. (AR 19.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 19.)

At step four, the ALJ determined that Plaintiff had the RFC to perform light work, except

3

that he would need a sit/stand option every 30 minutes. (AR 20.) The ALJ also found that Plaintiff could sit for 30 minutes at a time for six hours, could stand and/or walk for 30 minutes at a time for two hours, would not need to be off task during sit/stand options, would not need additional breaks besides customary ones, and could lift 20 pounds occasionally and ten pounds frequently. (AR 20.) Plaintiff could not: climb ladders, ropes, or scaffolds; work around unprotected heights or dangerous moving machinery; crawl; or perform overhead reaching bilaterally (except rarely). (AR 20.) Plaintiff could occasionally climb ramps and stairs, stoop, crouch, and kneel. (AR 20.) Plaintiff could frequently reach in other directions, and could frequently handle and do fine fingering. (AR 20.) Plaintiff would have rare to occasional limitations in maintaining emotional stability or predictability, meaning that he would be off task due to psychiatric symptoms up to 5% of the work month. (AR 20.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not consistent with the evidence in the record. (AR 22.)

First, the ALJ found that "the objective medical findings do not support the existence of limitations greater than those determined in the [RFC] above." (AR 22.) The ALJ then reviewed the medical evidence related to Plaintiff's physical condition. With respect to Dr. Lorber, the ALJ articulated Dr. Lorber's recommended RFC, which was nearly identical to the ALJ's ultimate RFC. (AR 22.) The ALJ summarized Dr. Lorber's testimony that he had considered Plaintiff's pain complaint and multi-level disc protrusions, and Dr. Lorber's belief that Plaintiff's claim that he could lift only five pounds was a self-described limitation. (AR 22.) Dr. Lorber also stated that as to Plaintiff's numbness in the fingers, EMG tests were negative for radiculopathy, but that he had considered Plaintiff's subjective complaints of radiating pain. Dr. Lorber opined, however, that there was no convincing evidence of radiculopathy in either the cervical or lumbar area. (AR 22.) The ALJ gave "great weight to Dr. Lorber's opinion because it is well supported by the overall objective medical evidence." (AR 22.)

Next, the ALJ described in chronological order various examinations and medical opinions

4

concerning Plaintiff's condition. (AR 23-28.) On September 20, 2011, Plaintiff had an x-ray which showed various disc protrusions and degenerative changes at C5-C6. (AR 23.) On October 7, 2011, Plaintiff visited Jason Lee, M.D., and had a physical examination. (AR 23.) Dr. Lee diagnosed cervical radiculopathy, cervical displaced disc, and cervical degenerative disc disease, and recommended conservative treatment consisting of physical therapy. (AR 23.)

On June 13, 2012, Vatche Cabayan, M.D. opined restrictions including no lifting, pulling or pushing more than twenty pounds, kneeling, climbing, squatting, or overhead work. (AR 24.) The ALJ "accord[ed] partial weight to Dr. Cabayan's opinion to the extent that it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 24.)

On July 17, 2013, Dr. Cabayan opined that Plaintiff should avoid repetitive stairs, hills, inclines, squatting, bending, forceful pushing, pulling, lifting and grabbing, heavy lifting, and uneven surfaces. (AR 24.) Again, the ALJ "accord[ed] partial weight to Dr. Cabayan's opinion to the extent that it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 24.)

On December 11, 2013, Jacquelyn Weiss, M.D. performed a neurological examination. (AR 25.) The ALJ described Plaintiff's statements and the physical examination results. (AR 25.) Dr. Weiss recommended that Plaintiff undergo injections rather than surgery, and opined that Plaintiff could work in a sedentary capacity. (AR 26.) The ALJ "accord[ed] partial weight to Dr. Weiss' opinion, as far as it is consistent with the opinion of medical evidence Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 26.)

On April 28, 2014, Plaintiff underwent a left shoulder operative arthroscopy, synovectomy, bursectomy, coracoacromial ligament release, and Neer type acromioplasty, followed by biceps tendon release and stabilization. (AR 26.)

On July 23, 2014, Dr. Cabayan opined that Plaintiff should avoid forceful pushing, pulling, and heavy lifting with the left upper extremity, and should do intermittent sitting, standing, and walking as tolerated. (AR 26.) The ALJ "accord[ed] partial weight to Dr. Cabayan's opinion regarding the claimant's limitations, to the extent that they are consistent with the opinion of Dr.

5

Lorber." (AR 26.)

On July 9, 2015, Calvin Pon, M.D., performed a consultative orthopedic evaluation. The ALJ described Plaintiff's statements and listed the physical examination results. (AR 26-27.) Dr. Pon opined that Plaintiff could stand and walk for approximately four hours, and sit for approximately 15 to 30 minutes alternating with standing and/or walking for 5 to 10 minutes. (AR 27.) Plaintiff could also occasionally stoop, crouch, kneel, squat, crawl, climb stairs and ladders, and perform pushing and pulling of left arm-hand control. (AR 27.) Plaintiff could frequently perform pushing left leg-foot control, and lift and carry 10 pounds frequently and 20 pounds occasionally with most of the lifting and carrying performed by the right upper extremity. (AR 27.) Dr. Pon opined that Plaintiff had no limits in reaching with the right shoulder, could occasionally reach with the left shoulder, and had no limits in performing gross and fine manipulation with both hands. (AR 27.) The ALJ "accord[ed] partial weight to Dr. Pon's opinion to the extent that it is consistent with medical expert Dr. Lorber's opinion's opinion, as Dr. Lorber's opinion is the most consistent with the record as a whole."

On August 18, 2015, Plaintiff had a medical reexamination by Marvin Zwerin, D.O., who opined that Plaintiff's drug and alcohol use was not related to his industrial claim or current level of disability. (AR 27.) The ALJ gave "partial weight to Dr. Zwerin's assessment is not [sic] a significant contributor to the claimant's disability status." (AR 27.)

On June 6, 2016, Plaintiff saw Richard Wyzykowski, M.D., who noted that Plaintiff's shoulder x-rays were within normal limits. (AR 27.) Dr. Wyzykowski diagnosed right biceps tendonitis and right shoulder impingement, and administered an injection. (AR 27.)

The ALJ then reiterated that she gave partial weight to Dr. Cabayan's opinions, and "credit[ed] those opinions only to the extent that they are consistent with the opinions of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 28.) The ALJ also gave partial weight to the State agency medical consultants who found that Plaintiff could perform a range of light work, but did not include a sit/stand option. (AR 28.) The ALJ found that those assessments were "not restrictive enough in light of the overall evidence of record, including evidence received at the hearing level."

6

As to Plaintiff's mental health, the ALJ stated that Plaintiff saw Dr. Vladmir Bokarius from April 2015 to October 2015. (AR 28.) The ALJ described Plaintiff's statements and mental status examination results. (AR 28.) Dr. Bokarius diagnosed major depressive disorder, partial remission; alcohol use disorder, early full remission; cocaine use disorder, early full remission; and a global assessment of functioning ("GAF") of 60. (AR 28.) Subsequent office visits showed improvement, including better mood and better sleep, and GAF scores between 61 and 67. (AR 28.) The ALJ "accord[ed] little weight to Dr. Bokarius' opinion indicating only mild symptoms. Rather, [the ALJ found] that the additional functional limitation set forth in the [RFC was] warranted based on the record as a whole." (AR 28.)

On June 9, 2015, Plaintiff had a consultative psychological evaluation with Patricia Spivey, Psy.D. (AR 28.) The ALJ described Plaintiff's statements and mental status examination results. (AR 28-29.) Dr. Spivey diagnosed depressive disorder, alcohol dependence in early full remission, and a GAF of 65. (AR 29.) Dr. Spivey believed Plaintiff's prognosis was very good, and found no limitation except for mild limitation in the ability to adapt to changes in job routine and withstand the stress of a routine workday, as well as a mild to moderate limitation in the ability to maintain emotional stability and predictability. (AR 29.) The ALJ gave "partial weight to Dr. Spivey's opinion. Although the claimant's depressive disorder appears mild, [the ALJ found] that the additional functional limitation set forth in the [RFC was] warranted based on the record as a whole." (AR 29.)

Next, the ALJ considered Plaintiff's testimony and subjective allegations. (AR 29.) The ALJ explained that there were significant inconsistencies in Plaintiff's testimony. For example, Plaintiff testified that he depended on his wife to do all the cooking and laundry, but that he had reported to Dr. Spivey that he could do household chores and could take care of the children. (AR 29.) Plaintiff also reported to Dr. Pon that he was able to cook and prepare his own meals, wash dishes, and take out the garbage. (AR 29.) Plaintiff reported to Dr. Cabayan that he makes his bed, sweeps, mops, vacuums, washes dishes, does laundry, cleans the bathroom, cooks, and does grocery shopping. (AR 29.) Plaintiff also reported to Dr. Zwerin that he was fully independent in all spheres of activities of daily living. (AR 29.)

7

The ALJ then considered the third-party statement of Josephina Figueroa-Flores Plaintiff's fiancée. (AR 29.) She reported that Plaintiff was in constant pain, could not bend or lift many things, did not prepare mails, could not lift more than ten pounds, could not stand for more than five minutes, and could not reach. (AR 29.) She also stated that his depression affected his way of functioning and socializing. (AR 29.) The ALJ "accord[ed] some weight to Ms. Figueroa-Flores' statement; however, to the extent that it suggests that the claimant is unable to perform work under the [RFC] determined herein, [the ALJ gave] it little weight." (AR 29.)

Finally, the ALJ found that Plaintiff was able to communicate in English. (AR 30.) The ALJ explained that although Plaintiff testified with the assistance of a translator, he "often seemed to understand [the ALJ's] questions before they were translated." (AR 30.) Plaintiff also stated that he spoke English at his doctor appointments, but asked a translator when he did not understand. (AR 30.) His wife sometimes helped with translations. The ALJ noted that there was no translator during Plaintiff's evaluations with Dr. Pon and Dr. Spivey, but that "he was more or less able to communicate with both doctors in English." (AR 30.) The ALJ thus concluded that Plaintiff's English was sufficient for the jobs named by the VE. (AR 30.)

At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed through the date last insured. (AR 30.) The ALJ found that based on Plaintiff's age, education, work experience, and RFC, in conjunction with the VE's testimony, that Plaintiff could perform jobs including an order caller and ticket taker. (AR 30-31.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (AR 31.)

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision on four grounds. First, Plaintiff argues that the ALJ erred in determining Plaintiff's English skills. (Plf.'s Mot. at 7.) Second, Plaintiff contends that the ALJ erred in evaluating medical opinions from Plaintiff's treating and examining physicians, instead relying solely on Dr. Lorber's opinion. (*Id.* at 12.) Third, Plaintiff argues that the ALJ improperly rejected Plaintiff's testimony as to the severity of his symptoms. (*Id.* at 15.) Finally, Plaintiff asserts that the ALJ improperly rejected the witness testimony of Plaintiff's fiancée. (*Id.* at 19.)

8

### A. Ability to Communicate in English

Plaintiff challenges the ALJ's finding regarding Plaintiff's English skills, specifically his ability to read or write. (Plf.'s Mot. at 8-9.) "The commissioner bears the burden of establishing that [a claimant] is literate." *Silveira v. Apfel*, 204 F.3d 1257, 1261. "A distinction exists between an assessment of literacy and an assessment of the ability to communicate in English. An ALJ must consider both in determining whether a claimant can perform work pursuant to the regulations." *Calderon v. Astrue*, Case No. 1:08-cv-1015 GSA, 2009 WL 3790008, at *9 (E.D. Cal. Nov. 10, 2009) (citing 20 C.F.R. §§ 404.1564(b), 416.964(b)). Illiteracy is "define[d] as 'the inability to read or write,'" and "refers to literacy in English." *Silveira*, 204 F.3d at 1261 (quoting 20 C.F.R. § 416.964(b)(1)). Communication in English concerns "the ability to speak, read and understand English . . . ." 20 C.F.R. § 404.1564(b)(5).

Here, the ALJ found that Plaintiff was able to communicate in English, but made no findings as to his literacy. In finding that Plaintiff was able to communicate in English, the ALJ focused solely on Plaintiff's ability to speak and understand spoken English, finding that Plaintiff seemed to understand the ALJ's questions before they were translated, and that several of the medical evaluations were done without a translator. (AR 30.) The ALJ, however, made no express findings as to Plaintiff's ability to read or write in English, which affects any conclusions regarding both Plaintiff's literacy and English communication skills. The "failure to make a finding as to literacy and to provide reasons for the finding made as to English communication abilities warrant remand for determination of these issues." *Garcia v. Astrue*, Case No. 1:11-cv-1956-SKO, 2013 U.S. Dist. LEXIS 12758, at *20 (E.D. Cal. Jan. 30, 2013); *see also Silveira*, 204 F.3d at 1261-62 (remanding case where the ALJ made no express finding that the claimant was literate in English); *Calderon*, 2009 WL 3790008, at *10 ("because the capability to communicate in English pertains to one who can speak, *read*, and understand the language, the lack of information in the record pertaining to Plaintiff's ability to read is insufficient to uphold the ALJ's finding regarding Plaintiff's ability to communicate") (internal quotation omitted). This is particularly the case here where the only evidence regarding Plaintiff's ability to read and write in English appears to be Ms. Figueroa-Flores's third-party function report, in which she states that

Plaintiff is not able to pay bills, handle a savings account, or use a checkbook because he "doesn't know how to read or write." (AR 306.) Likewise, Ms. Figueroa-Flores states that she usually accompanies Plaintiff to his doctor appointments "because he can't read or write," and that he is not good at following written instructions because "[h]e can't read or write." (AR 307-08.)[1]

Defendant argues that there is no error because "[t]he VE testified that the order caller and ticket taker occupations required only some informal communication in English." (Def.'s Opp'n at 4; *see also* AR 117.) Defendant contends that combined with Plaintiff's admissions that he "spoke a little English," this shows that Plaintiff had the requisite level of English proficiency. (Def.'s Opp'n at 5.) The Court disagrees. Again, "communication" includes both speaking and *reading* English, and the ALJ made no express findings that Plaintiff was capable of reading English, whether formally or informally. The VE did not testify that no reading was required for these positions. Moreover, it is unclear what "informal communication" means, or how the ALJ determined that Plaintiff was capable of that level of English.

Accordingly, the Court finds remand is necessary for findings as to Plaintiff's ability to read or write in English.

### B. Medical Opinions

Next, Plaintiff contends that the ALJ erred in evaluating the medical opinions from his treating and examining physicians. In evaluating medical evidence from different physicians, the Ninth Circuit distinguishes among the opinions of three types of physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The three types are classified as: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Id.* A treating physician's opinion is entitled to controlling weight if it is well-supported and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The opinions of treating medical sources may be rejected only for clear and convincing reasons if not contradicted

---

[1] As discussed below, it was also error for the ALJ to reject Ms. Figueroa-Flores's third-party statement without explanation, to the extent it concerned limitations not raised in Plaintiff's testimony.

10

by another doctor, and, if contradicted, only for specific and legitimate reasons supported by substantial evidence. *Lester*, 81 F.3d at 830.

Here, the ALJ listed the various test results and opinions of the doctors, before giving the opinion partial weight "to the extent that it is consistent with medical expert Dr. Lorber's opinion, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 24, 26, 27, 28.) This constitutes error in several ways. First, Dr. Lorber was a non-examining physician, and "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831.

Second, the ALJ failed to explain why the opinions she rejected were not consistent with the record as a whole, or why Dr. Lorber's opinion was consistent with the record. "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required . . . ." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1998). Instead, "[t]he ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Id.* at 421-22. Here, the ALJ simply listed the various medical records, but otherwise failed to provide interpretations of the medical evidence or explain why those interpretations were correct. Almost every opinion was then rejected in part to the extent it was consistent with Dr. Lorber's opinion, without explanation for why Dr. Lorber's opinion was more consistent with the record. (*See* AR 24 (giving partial weight to Dr. Cabayan's June 13, 2012 opinion "to the extent that it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole"), 24 (giving partial weight to Dr. Cabayan's July 17, 2013 opinion "to the extent that it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole"), 26 (giving partial weight to Dr. Weiss's opinion, "as far as it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole"), 26 (giving partial weight to Dr. Cabayan's July 23, 2014 opinion "to the extent that they are consistent with the opinion of medical expert Dr.

Lorber"), 27 (giving partial weight to Dr. Pon's opinion "to the extent that it is consistent with medical expert Dr. Lorber's opinion, as Dr. Lorber's opinion is the most consistent with the record as a whole"), 28 (giving partial weight to Dr. Cabayan's 2014-016 opinions "to the extent that they are consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole").) In some cases, the ALJ provided no explanation for why she gave partial weight to a doctor's opinion, even when that opinion was fully consistent with her ultimate conclusions. For example, the ALJ, without explanation, gave only partial weight to Dr. Zwerin's opinion that Plaintiff's prior alcohol and drug use was not a significant contributor to his disability, despite concluding that Plaintiff's history of substance abuse did not more than minimally affect his ability to work. (*See* AR 19, 27.) In short, the ALJ failed to explain how she weighed any of the medical opinions. Remand is warranted so that the ALJ can review the medical evidence and provide sufficient explanation for how she interpreted the objective findings and weighed the various opinions.

The government responds that the ALJ could properly rely on Dr. Lorber's testimony because his opinion was consistent with the "overall objective medical evidence." (Def.'s Opp'n at 7.) The ALJ, however, also provided no explanation for why Dr. Lorber's opinion was consistent with the independent clinical findings. Rather, the ALJ simply summarized Dr. Lorber's testimony without explaining which clinical findings supported his opinion. Thus, the Court cannot determine how the ALJ found that Dr. Lorber's opinion was consistent with the overall medical evidence, as she provided no explanation for why the medical evidence supported her conclusions.

Second, the government contends that the ALJ properly rejected Dr. Cabayan's and Dr. Weiss's opinions because the opinions lacked sufficient record support, pointing to various clinical results. (Def.'s Opp'n at 9.) Again, however, the ALJ did not provide any interpretation of these clinical results. She simply listed the results before giving the opinions partial weight "to the extent that it is consistent with the opinion of medical expert Dr. Lorber, as Dr. Lorber's opinion is the most consistent with the record as a whole." (AR 24, 26, 27, 28.) By failing to interpret these clinical results and its effect on the validity of the medical opinions, the ALJ failed

12

to provide any legitimate reason for rejecting these opinions.

The Court, however, finds that the ALJ did not err in failing to address the opinion of Joshua C. Richards, M.D. (*See* Plf.'s Mot. at 14.) Dr. Richards examined Plaintiff on August 23, 2013. (AR 533.) He opined that Plaintiff could never lift more than ten pounds with his left arm and to avoid repetitive overhead work. (AR 535.) Defendant contends that the ALJ's failure to discuss Dr. Richards' opinion is harmless because Dr. Richards's opinion was consistent with the RFC, which found that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and that he could only rarely perform overhead reaching bilaterally. (Def.'s Opp'n at 10; AR 20.) The Court agrees that the restrictions opined by Dr. Richards are consistent with the ALJ's RFC, and thus any harm from not addressing Dr. Richards's opinion is not prejudicial. The ALJ did, however, err as to her evaluation of the other medical opinions.

### C. Plaintiff's Testimony

Plaintiff also argues that the ALJ erred in rejecting Plaintiff's testimony as to the severity of his symptoms. (Plf.'s Mot. at 15.) The Court disagrees. In the absence of affirmative evidence of malingering, the ALJ may reject a claimant's testimony by offering clear and convincing reasons for doing so. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). In weighing a claimant's credibility, an ALJ may consider "the claimant's daily activities." *Id.* (internal quotation omitted). "Daily activities can form the basis of an adverse credibility finding where the claimant's activities (1) contradict her other testimony or (2) meet the threshold for transferable work skills." *Sabin v. Astrue*, 337 Fed. Appx. 617, 620 (9th Cir. 2009) (citing *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

Here, Plaintiff testified that he was dependent on his wife, and that she took care of the cooking and washing his clothes. (AR 94.) The ALJ noted, however, that this contradicted his reports to his doctors regarding his daily activities. (AR 29.) For example, he told Dr. Spivey that he could do household chores and take care of the children. (AR 977.) He likewise told Dr. Pon that he could cook and prepare his own meals, wash the dishes, and take out the garbage. (AR 981.) Plaintiff also told Dr. Cabayan that he could make his bed, sweep, mom, vacuum, wash dishes for two minutes, do laundry, clean the bathroom, and cook for thirty minutes. (AR 420.)

13

Finally, Plaintiff told Dr. Zwerin that he was fully independent in all spheres of activities of daily living. (AR 550, 570, 1024.) In short, The ALJ could find Plaintiff not credible, as his testimony was contradicted by his daily activities as reported to his doctors.

Plaintiff responds that any reports to Dr. Pon or Dr. Spivey were unreliable because Dr. Pon and Dr. Spivey did not use a translator. (Plf.'s Mot. at 17.) Plaintiff contends this could have resulted in incorrect information, particularly when Dr. Spivey had other incorrect information such as the number of times Plaintiff had been divorced and the number of adult children he had. (*Id.* at 18.) It is speculative, however, to conclude that Dr. Pon and Dr. Spivey both incorrectly understood Plaintiff's daily life activities. Moreover, even if they had, Plaintiff does not argue that Dr. Cabayan or Dr. Zwerin misinterpreted Plaintiff's daily life activities. Indeed, Dr. Cabayan provides a translator for Plaintiff's appointments. (AR 30.) Thus, even if the Court was to exclude Dr. Pon's and Dr. Spivey's reports as unreliable, Plaintiff's daily activities as reported to Dr. Cabayan and Dr. Zwerin directly contradict his testimony that he was dependent on his wife for cooking and laundry.

Plaintiff also argues that the fact that he can perform activities of daily living is not a reason to discredit Plaintiff. (Plf.'s Mot. at 18.) The ALJ, however, did not find that Plaintiff's ability to perform activities of daily living alone was discrediting. Rather, the ALJ explained that his testimony itself was inconsistent with his daily activities, based on his reports to the other doctors. Again, daily activities can serve as clear and convincing reasons for rejecting a claimant's testimony when they contradict his other testimony, as is the case here. *Cf. Orn*, 495 F.3d at 639. Thus, the ALJ did not err in finding Plaintiff's testimony not credible.

### D. Third-Party Testimony

Finally, Plaintiff argues that the ALJ erred in rejecting Ms. Figueroa-Flores's third-party statement without explanation. (Plf.'s Mot. at 19.) Defendant "concedes that the ALJ did not provide germane reasons for discounting this testimony in the decision," but argues that "because Plaintiff's fiancée echoed Plaintiff's own allegations of disabling symptoms and functional limitations, the ALJ's specific, well-supported bases for discounting Plaintiff's allegations were equally applicable to his fiancée's allegations." (Def.'s Opp'n at 16.)

"Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se." *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012). Like Plaintiff, Ms. Figueroa-Flores stated that Plaintiff could not prepare meals, which was directly contradicted by Plaintiff's daily activities as reported to the other doctors. Thus, the ALJ's reasons for rejecting Plaintiff's testimony applies to Ms. Figueroa-Flores's testimony, but only to the extent that her statement described limitations already identified in Plaintiff's testimony. Anything outside of his testimony, including his ability to read or write in English, was not properly rejected, as the ALJ provided no explanation for rejecting that part of her testimony. On remand, the ALJ must consider Ms. Figueroa-Flores's third-party statement, and provide sufficient explanation to the extent the ALJ rejects her statement.

## V. CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion for summary judgment and DENIES Defendant's cross-motion for summary judgment. The Court remands this case for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated: September 30, 2019

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　KANDIS A. WESTMORE
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge